# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| NATIONWIDE MUTUAL INSURANCE COMPANY, ) | |
| | |
| ) | |
| PLAINTIFF, | |
| ) | |
| VS. | 2:08-cv-453-JHH |
| ) | |
| EARL GIBSON; GIBSON & ANDERSON CONSTRUCTION, INC.; GEORGE SALEM; and JOYCE SALEM, ) | |
| | |
| ) | |
| DEFENDANTS. ) | |

## MEMORANDUM OF DECISION

The court has before it the April 2, 2009 motion (Doc. # 29) of plaintiff Nationwide Mutual Insurance Company (hereinafter "Nationwide") for summary judgment against defendants Earl Gibson, Gibson & Anderson Construction (hereinafter, collectively, "the Gibson defendants"), and George and Joyce Salem. Pursuant to the court's April 3, 2009 order (Doc. #31), the motion was deemed submitted, without oral argument, on April 30, 2009.

## I.    Procedural History

Plaintiff Nationwide commenced this action on March 13, 2008, by filing a declaratory judgment action, pursuant to 28 U.S.C. §§ 2201 *et seq.*  Nationwide seeks

a declaration from this court regarding "whether Nationwide owes a duty to defend and/or indemnify" the Gibson defendants in a lawsuit filed by defendants George and Joyce Salem (hereinafter, collectively, the "Salems"), currently pending in the Circuit Court of Shelby County, Alabama, against the Gibson defendants (hereinafter referred to as the "underlying lawsuit").[1]  (Compl. ¶ 19(d)).  On April 7, 2008, the Gibson defendants asserted counterclaims (Doc. #11) against Nationwide for breach of contract, bad faith, negligence and wantonness.  On June 19, 2008, the court dismissed the counterclaims for negligence and wantonness.  (Doc. #20). Nationwide's motion for summary judgment asserts that there is no genuine issue of material fact and that Nationwide is entitled to judgment as a matter of law as to both the declaratory judgment action and the two remaining counterclaims.  (*See* Doc. #29).

---

[1] The underlying complaint alleges that within the first year after the Salems' October 2002 purchase of a home constructed by the Gibson defendants, they discovered "numerous latent defects with their home." (Shelby County Compl, ¶ 9). After notifying the Gibson defendants of the defects, the Gibson defendants performed repairs to the Salems' home in 2004. (Shelby County Compl, ¶ 9; Counterclaim ¶ 10).  The Salems allege that those 2004 repairs were performed in a negligent manner, causing additional damage to the underlying structure of their home.  (Shelby County Compl, ¶ 10; Counterclaim ¶ 10).  However, the underlying complaint asserts that the allegedly negligent repair work was not discovered by the Salems until approximately Fall 2006.  (Shelby County Compl, ¶ 9; Counterclaim ¶ 11).  Additionally, the Salems allege that there are conditions in their home "which are causing to the [sic] active moisture intrusion and damage at the residence" and that "new and distinct damages caused by [Gibson & Anderson Construction's] negligence continue to occur to this date and new damage will continue to occur for the foreseeable future." (Shelby County Compl, ¶¶  9, 16; Counterclaim ¶¶ 12-13 (quoting underlying lawsuit)).

2

All parties have filed briefs and submitted evidence in support of their respective positions. Nationwide submitted a brief (Doc. # 29) and evidence[2] (Doc. # 30) in support of its own motion for summary judgment on April 2, 2009. On April 23, 2009, the Gibson defendants filed a brief (Doc. # 34) and evidence[3] (Doc. # 33) in opposition to Nationwide's motion for summary judgment. On April 27, 2009, defendants George and Joyce Salem also filed a brief (Doc. #35) in opposition to the motion for summary judgment, incorporating in full the brief filed by the Gibson

---

[2] Nationwide submitted the following evidence: policies of insurance at issue; real estate sales contract between the Salems and Gibson & Anderson Construction; closing documents; underlying complaint; 9/12/2003 letter to Salems from Gibson & Anderson; 9/18/2003 letter from Burttram to Gibson & Anderson; 10/10/2003 letter from Logsdon to Burttram; 10/27/2003 letter from Logsdon to Burttram; 10/31/2003 letter from Burttram to Logsdon; 11/3/2003 letter from Logsdon to Burttram; 11/26/2003 letter from Logsdon to Burttram; 12/10/2003 letter from Burttram to Logsdon; 12/30/2003 quote from Spectrum; 1/2/2004 letter from Logsdon to Burttram; 1/15/2004 letter from Burttram to Logsdon; 1/27/2004 letter from Burttram to Logsdon; 5/24/2004 letter from Burttram to Logsdon; 11/19.2004 letter from Burttram to Logsdon; 8/21/2007 letter from Gibson & Anderson to Hayes-Rasbury Agency and Trammel, Harper & Williams; 10/3/2007 letter facsimile from Gibson & Anderson to Nationwide with attachments; 11/8/2007 letter from Nationwide to Gibson & Anderson; 1/22/2008 letter from Nationwide to Gibson & Anderson; 1/23/2008 letter from Nationwide to Gibson & Anderson; 1/23/2008 reservation of rights letter; 1/30.2008 facsimile from Gibson & Anderson to Nationwide with attachments; 2/18/2008 e-mail from Clement to Nationwide; claim log notes; 2/18/2008 letter from Nationwide to Logsdon; 2/19/2008 letter from Nationwide to Bodin; *Nationwide v. Williams, et al.*, 4:06-cv-1134-RDP; and magistrate report and recommendation in 4:06-cv-1155-JEO.

[3] The Gibson defendants submitted the following evidence: affidavit of Joyce Salem; affidavit of Ed Anderson; and February letter from Logsdon to Nationwide.

defendants.  On April 30, 2009, Nationwide filed a brief (Doc. # 37) in reply[4] to the opposition of defendants.

## II.     Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *See id.* at 324.

---

[4] The court notes that the reply brief filed by Nationwide is 19 pages despite the court's ten-page limitation for reply briefs, which was outlined in the court's submission order (Doc. #31). Nationwide failed to file a motion requesting that the court allow it to submit additional pages. Nevertheless, because of the many issues addressed by the parties' summary judgment submissions, the court, *sua sponte,* has allowed the additional pages and has considered the arguments presented therein.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; *i.e.* facts that would entitle it to a directed verdict if not controverted at trial. *See Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to *affirmatively* show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  *See Fitzpatrick*, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer

6

rest on mere allegations, but must set forth evidence of specific facts.  *See Lewis v.*

*Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

561 (1992)).

## III.   Relevant Undisputed Facts[5]

The facts of this case are not in dispute.  They do, however, traverse an almost

six-year period of time.  For the sake of simplicity, the court has attempted to recount

the facts in chronological order, but due to gaps in the record and in order to facilitate

the most logical presentation, some of the facts appear out of sequence.

### A.   The Salem Residence and Alleged Problems

On May 23, 2002, the Salems entered into a contract with Gibson & Anderson

Construction to purchase a new home located in Hoover, Alabama, which was

constructed by that company.  (Pl. Ex. 2, Sales Contract).  The Salems closed on the

home on October 30, 2002.  (Pl. Ex. 3, Closing Documents; Pl. Ex. 4, Shelby County

Compl).  Within the first year of living in the home, however, the Salems "discovered

numerous latent defects with their home."  (Shelby County Compl. at 2).  The alleged

defects included "moisture intrusion and related damage in the master bedroom."

(Def. Ex. 1, Joyce Salem Aff.).

--------------------------------

[5] If the facts are in dispute, they are stated in a manner most favorable to the non-movant.
*See Fitzpatrick*, 2 F.3d at 1115.

After discovering the problems, the Salems, in accordance with the home warranty, notified the Gibson defendants of the alleged defects.  (Shelby County Compl. at 2).  On September 12, 2003, the Gibson defendants responded to the Salems by letter, requesting that they "have the opportunity to evaluate any problem and . . . repair" any damage deemed to be their responsibility.  (Pl. Ex. 5).  On September 18, 2003, the Salems, through their attorney, notified the Gibson defendants that they were having the house inspected, with a specific focus on the moisture and mold problems, and would be in touch after obtaining those results.  (Pl. Ex. 6).  The Salems also stated that they did not intend to undertake any repairs themselves.  (*Id*.).  The Gibson defendants acknowledged receipt of this letter on October 10, 2003, through their attorneys,  (Pl. Ex. 7), and on October 27, 2003 the Gibson defendants requested the opportunity to view the alleged problems and to cure.  (Pl. Ex. 8).

On October 31, 2003, the Salems' attorney forwarded to the attorney for the Gibson defendants a mold sampling analysis report and list of six known problems, including:  (1) mold, especially in the master bedroom and bathroom; (2) standing water in the plastic meter boxes in the front shrubbery; (3) sprinkler system heads spraying water on the house; (4) air conditioner freezing up; (5) drainage problems in the back yard; and (6) standing water around the shrubbery.  (Pl. Ex. 9).  The letter

8

stated that the Salems would make their home available for inspection by the Gibson defendants.  (*Id.*). Additionally, the letter advised that the mold problem was "quite serious" and that Mrs. Salem was "constantly ill and that Mr. Salem can no longer sleep in the master bedroom."  (*Id.*).  For the last two months of 2003, the attorneys continued to exchange letters regarding the damage, scheduling of inspection by the Gibson defendants, the possibility of repairs,  and the health of the Salems.  (Pl. Exs. 10-12).

On January 2, 2004, the Gibson defendants notified the Salems, via their attorneys, that after inspection of the home by a mold solutions company, they had "made arrangements to do work to the Salem residence," and they enclosed a proposal for remediation of the mold issue.  (Pl. Exs. 13-14).  On January 15, 2004, the Salems requested that the Gibson defendants proceed with the mold removal "ASAP," and they reiterated their request that the Gibson defendants address the other issues on the "problems" list which had been forwarded to them in October 2003.  (Pl. Ex. 15).  The Salems further warned that if the Gibson defendants did not remedy those problems, the Salems would "be forced to mediate and/or arbitrate to resolution."  (*Id.*).  Two weeks later, the Salems' attorney noted dissatisfaction with the Gibson defendants' failure to complete any repair work, and he suggested a mediator.  (Pl. Ex. 16).

9

At some point after this letter, however, the Gibson defendants "replaced and repapered the walls in the master bedroom." (Shelby County Compl. at 2; Salem Aff.). Although Joyce Salem stated in her affidavit to this court that she was "happy with the outcome," (Salem Aff.), in late May 2004, the attorney for the Salems notified the attorney for the Gibson defendants that the Salems were not satisfied with the repairs. (Pl. Ex. 17). Specifically, the letter noted that "water continues to stand in the sprinkler boxes" with "the ground being saturated constantly with water." (*Id*.). In relation to the mold, the letter observed that the repairs to the master bathroom tearing out "the moldy wall" had yet to be completed. (*Id*.). The Salems also expressed their frustration with not having been told what caused the mold or how it was corrected, which caused them concern that the mold would quickly return. (*Id*.). In November 2004, the Salems again notified the Gibson defendants that the repair work was still incomplete. (Pl. Ex. 18).

### B.    The Problems Return

For the period of almost two years thereafter, the record is silent as to any complaints made by the Salems, any evidence that the requested repairs were completed, or, for that matter, any correspondence between the Salems and the Gibson defendants. In September 2006, however, the Salems again noticed evidence of moisture and other damage in their master bathroom. (Salem Aff.). At that time,

10

the Salems notified the Gibson defendants that "the repair work did not correct the problems with the original construction and that the remediation efforts had failed." (Shelby County Compl. at 3).  According to the Salems, the "repairs were performed in a negligent manner causing additional damage to the underlying structure of the home." (*Id.*).

As a result of the damage discovered in approximately September 2006, the Salems had to "undertake numerous steps to identify the cause and extent of the damage to the home," including an "invasive investigation" for which the Gibson defendants were present.  (*Id.*).  The investigation revealed "evidence that the causative factors for the previous intrusion and resulting damage had been concealed during the repair attempts in 2004." (*Id.*).  It also revealed "numerous building violations . . . some of which are causing to the active moisture intrusion and damage at the residence." (*Id.*).  Specifically, the Salems allege that the following seven conditions should have been repaired during the initial remediation efforts by the Gibson defendants: "(a) improper moisture barrier installation; (b) lack of proper through-wall brick flashing; (c) lack of proper air spacing between brick veneer and moisture barrier; (d) lack of proper weep holes in brick veneer; (e) unprotected and concealed exterior wall cavity and plumbing supply lines; (f) HVAC operating at

negative pressure; and (g) brick veneer below grade with improper or omitted waterproofing." (Shelby County Compl. at 3).

In addition to property damage to their home, the Salems also contend that they have suffered "other damages including emotional distress, physical injury and depreciation of property value." (*Id.* at 4). Joyce Salem has "sought medical treatment for allergies and associated physical ailments/injuries . . . sustained as a result of the moisture intrusion and related damage" in the home. (Salem Aff.).

### C.    The Nationwide Policy

On December 29, 2003, during the time period when the parties' attorneys were exchanging letters regarding the first round of damage discovered by the Salems, including trying to schedule the initial repairs and inspection by the Gibson defendants (Pl. Exs. 10-12), Nationwide issued a Blanket Protector Business Policy (hereinafter the "Policy") to the Gibson defendants. (*See* Pl. Ex. 1). The Policy remains in effect to the present date and provides "business liability" coverage which is described as follows: "[w]e will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' . . . [or] 'property damage' to which this insurance applies." (*Id.*). It further states that "[n]o other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided

12

for under COVERAGES A or B or MEDICAL EXPENSES UNDER COVERAGE

C." (*Id*.).

Specifically, the Policy provides that the "insurance applies to 'bodily injury'

and 'property damage'" only if:

> (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "covered territory"; and
>
> (2) The "bodily injury" or "property damages" occurs during the policy period.
>
> (3) Prior to the policy period, no insured . . . and no [authorized] "employee" . . . knew that the "bodily injury" or "property damage" had occurred, in whole or in part, if such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.
>
> . . .
>
> d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured . . . or any [authorized] "employee" . . . receive notice of an "occurrence" or claim:
>
> (1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;
>
> (2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or
>
> (3) Becomes aware by other means that "bodily injury" or "property damage" has occurred or has begun to occur.

e.   Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury."

(*Id.*).  Certain exclusions to coverage and definitions of the relevant terms further outline the scope of coverage.[6]  (*Id.*).

Although the Gibson defendants were aware of the problems alleged by the Salems at the time the Policy was issued in late December 2003, it is undisputed that they did not notify Nationwide of the issues at the Salem residence at that time. Indeed, it was not until sometime around August 21, 2007, that the Gibson defendants notified Nationwide[7] of the claims made by the Salems against them, specifically noting that it "appears that [the Salems] seek[] to pursue . . . litigation." (Pl. Ex. 19). The Gibson defendants requested that Nationwide "immediately defend, indemnify and/or settle these claims and reimburse us for legal fees incurred since notice was provided."[8]  (*Id.*).

---

[6] The court does not reproduce all of those provisions here.  Instead, the court will refer to them as necessary in the substantive discussion of the court's reasoning for this decision.

[7] The letter also notified another insurance company with which the Gibson defendants had a policy.

[8] On October 3, 2007, the Gibson defendants forwarded certain attorney's bills to Nationwide requesting reimbursement for services rendered dating from January 23, 2007.  (Pl. Ex. 20).

**D.     The Salems File a Complaint**

On October 2, 2007, four years after the Gibson defendants were first notified of alleged problems with the Salems' home, the Salems filed a complaint against them in the Circuit Court of Shelby County, Alabama.  (Shelby County Compl. at 1).  The complaint asserts nine causes of action, including negligent construction, negligent hiring/supervising/training, misrepresentation/innocent fraud, suppression, breach of implied warranty of habitability, breach of contract, and breach of express warranty.  (*Id.* at 4-12).  The Salems seek damages for repairs, emotional distress, physical injury, and depreciation of property value, among other things.  (*Id.*).  The Gibson defendants were served with the complaint on December 13, 2007, and they forwarded the complaint to Nationwide on December 17, 2007.  (*See* Pl. Ex. 22).

**E.     Coverage Issues Presented by the Nationwide Policy**

On November 8, 2007, Nationwide acknowledged receipt of the claim made by the Gibson defendants under the Policy in August 2007.  (Pl. Ex. 21).  Nationwide stated that "[t]he reported facts give rise to some potential coverage questions under the" Policy, specifically "the date in which the incident occurred."  (*Id.*).  The letter further stated that Nationwide needed more information to assess the claim and that "[t]he company's position relative to coverage will be stated upon completion of this assessment."  (*Id.*).

15

During the continued investigation of the claim by Nationwide, Nationwide provided a defense to the Gibson defendants against the claims made by the Salems, subject to a reservation of rights. (*See* Pl. Ex. 22).   The record is silent as to the exact date on which Nationwide assumed defense of the Gibson defendants, but it appears that it occurred sometime between August 21, 2007 and January 22, 2008. (*See* Pl. Exs. 21-22).[9]   Throughout the months of January and February 2008, Nationwide continued to investigate the claims made by the Salems to determine its position on coverage under the Policy. (*See* Pl. Exs. 22-26).   On February 18, 2008, Nationwide notified the Gibson defendants that, as a result of its investigation, it had concluded that it did not have a duty to defend nor indemnify the Gibson defendants for the lawsuit filed by the Salems, and that accordingly, Nationwide would cease its defense of the Gibson defendants as of March 9, 2008.  (Pl. Ex. 28).

## IV.    Applicable Substantive Law and Analysis

In this lawsuit, Nationwide seeks a declaration from this court as to "whether Nationwide owes a duty to defend and/or indemnify" the Gibson defendants in the underlying lawsuit. (Compl. ¶ 19(d)).  After considering multiple motions to dismiss, the court determined that this action would proceed to final ruling on the duty to

---

[9] The Gibson defendants' counterclaim avers, without citation to evidence: "By letter dated December 21, 2007, Gibson Anderson received correspondence from an attorney stating that he was defending Gibson Anderson in the Underlying Lawsuit."  (Doc. # 11, at 7, ¶ 3).

defend issue.  (*See* Doc. #20 at 7-9).  The court concluded, however, that the issue of Nationwide's duty to indemnify would "not be considered by the court until the earlier of (a) final disposition of the underlying lawsuit, or (b) a ruling on the duty to defend . . . ." (*Id.* at 9).

As such, the court addresses in this opinion only the issue of Nationwide's duty to defend the underlying lawsuit, which is before it upon motion for summary judgment by Nationwide.   The court will then proceed to analyze the counterclaims alleged by the Gibson defendants.  The issue of Nationwide's duty to indemnify is not properly before the court at the court at this time.  (*Id.*).

### A.     Nationwide's Duty to Defend

Nationwide makes the following six arguments in support of its argument that it lacks any duty to defend the Gibson defendants against claims made by the Salems: (1) the damages at issue were detected before the inception of the Policy and thus, the alleged "bodily injury" and "property damage" occurred outside the Policy period; (2) the alleged improper construction and repairs do not constitute an "occurrence;" (3) the "your product" or "your work" exclusion applies; (4) the late notice given to Nationwide precludes coverage; (5) there is no coverage for economic damage; and (6) the fungi or bacteria exclusion applies.  (Doc. #29 at 22-44).  The Gibson defendants disagree with Nationwide and argue that Nationwide has a duty to defend

because: (1) the *repairs*, which occurred in 2004, were within the Policy period and constituted an "occurrence" under the Policy; (2) the notice given was reasonable; and (3) the exclusions do not apply.  (Doc. #34 at 14-32).   For the reasons outlined below, the court agrees with Nationwide.

Before delving into the pertinent analysis, however, the court first observes that because it is the duty to *defend* - and not the duty to indemnify - that is at issue at this point in the case, the court's duty inquiry is primarily based upon a comparison of the Policy provisions with the allegations of the underlying complaint.  *American States Ins. Co. v. Cooper*, 518 So.2d 708, 709 (Ala. 1987)("An insurance company's duty to defend its insured is determined by the language of the insurance policy and by the allegations in the complaint giving rise to the suit against the insured."); *Acceptance Ins. Co. v. Brown*, 832 So.2d 1, 14 (Ala. 2001)("Whether an insurance company owes its insured a duty to provide a defense in proceedings instituted against the insured is determined primarily by the allegations contained in the complaint.").   "If the allegations accuse the insured of actions for which the insurance company provides protection, the insurance company is obligated to defend the insured," regardless of the matter of ultimate liability.  *Cooper*, 518 So.2d at 709.  On the other hand,  "[i]f the complaint suggests that the injury alleged may not be within the coverage of the policy, then other facts outside the complaint [which may be proved by admissible

18

evidence] may be taken into consideration." *Ladner & Co. v. Southern Guaranty Ins. Co.*, 347 So.2d 100, 103 (Ala. 1977)(noting that the Alabama Supreme Court "has rejected the argument that the insurer's obligation to defend must be determined solely from the facts alleged in the complaint in the action against the insured" and reiterating that the additional facts that may be considered are those which "may be proved by admissible evidence").

Under either circumstance, the duty to defend is analyzed apart from the question of indemnification, because "it is well settled "that [an] insurer's duty to defend is more extensive than its duty to [indemnify]." *United States Fid. & Guar. Co. v. Armstrong*, 479 So.2d 1164, 1168 (Ala.1985) (citations omitted). Indeed, "when a complaint alleges both acts covered under the policy and acts not covered, the insurer is under a duty to at least defend the allegations covered by the policy. *Brown*, 832 So.2d at 14. Against that backdrop of applicable standards, the court begins its substantive analysis of the duty to defend.

### 1. The Alleged "Bodily Injury" and "Property Damage" Occurred Outside of the Policy Period

As outlined earlier, *see* Section III.C. *supra*, the Nationwide Policy applies to "bodily injury" and "property damage" that occurs "during the policy period" and is

caused by an "occurrence." (Pl. Ex. 1).[10]   Additionally, the Policy cautions that if the

insured knew that the "'bodily injury' or 'property damage' had occurred, in whole

or in part" before the Policy period began, "then *any continuation, change or*

*resumption* of such 'bodily injury' or 'property damage' . . . will be deemed to have

been known prior to the policy period" and thus will not be covered.  (*Id.*)(emphasis

added).[11]

> a.    **The first wave of damage discovered in 2003 occurred**
> **before the Policy was issued and is not covered**

As an initial matter, the court notes that the parties do not meaningfully dispute

that the first wave of "bodily injury" and "property damage" - which was discovered

by the Salems in 2003 and reported to the Gibson defendants by September of that

year - occurred months before the Policy was issued and is, therefore, outside of the

---

[10]In this section, however, the court does not address the substantive definition of "occurrence" but instead assumes, for the sole purpose of its analysis here, that the "bodily injury" or "property damage" in this case meets that definition. In the following section, however, the court will address the "occurrence" definition, ultimately concluding that even if the court is incorrect in its conclusion regarding the timing of the "bodily injury" or "property damage," the repairs made in 2004 nevertheless fail to constitute an "occurrence" under the Policy.  *See* discussion *infra* Section IV.A.2.

[11]  The court is well-aware that "provisions of [an insurance] policy cannot be read in isolation, but, instead, each provision must be read in context with all other provisions." *Allstate Ins. Co. v. Hardnett*, 763 So.2d 963, 965 (Ala. 2000).  Moreover, ambiguous policy language "will be construed liberally in favor of the insured." *Ho Brothers Restaurant v. Aetna Casualty & Surety Co.*, 492 So.2d 603, 605 (Ala.1986).

scope of coverage.  A time line of relevant events sets the plumb line for pre-Policy

damage and damage which occurred during the Policy period:

- **October 30, 2002**: The Salems purchase their home from the Gibson defendants.

- **2003:**  The Salems notice "latent defects" in their residence, including moisture problems, which have caused damage to the structure, loss of property value, mental anguish, and physical ailments.

- **September 12, 2003**: The Gibson defendants respond to the Salems' complaint regarding mold and moisture problems in the residence.

- **December 29, 2003**: Nationwide issues the Policy to the Gibson defendants.

- **Early 2004**:  The Gibson defendants commence repair work on the residence.

- **September 2006**: The Salems notice more evidence of moisture intrusion in their residence, which has caused additional structural damage, loss of property value, mental anguish, and physical ailments.  The Salems notify the Gibson defendants that they believe the repair work failed to correct the problems with the original construction.

Indeed, the Gibson defendants essentially (albeit not explicitly) concede that any

complaints regarding damage discovered in 2003, which *undisputedly* was related to

the original construction of the home, are not covered by the Policy.  (Doc. #34 at 23

("As previously explained, Gibson & Anderson only seek coverage from Nationwide

for the 'occurrence' after the inception of the Nationwide Policy Period, *i.e.*, the water

intrusion and allegedly negligent repairs")).

> **b.    To fall within the scope of coverage, any damage that occurred during the Policy period must have a cause independent of the cause of pre-Policy damage**

The focus of the parties' arguments, therefore, is whether the repairs made by

the Gibson defendants in 2004, in response to those initial damage complaints, caused

*additional and new* bodily injury or property damage that is covered by the Policy.

As noted earlier, to be covered under the Policy, the bodily injury or property damage

at issue must have occurred during the Policy period and must have been caused by

an "occurrence," defined by the Policy as "an accident, including continuous or

repeated exposure to substantially the same general harmful conditions." (Pl. Ex. 1).

However, even accidental damage that takes place during the Policy period *will not*

be covered if it is a "continuation, change or resumption" of damage that was

discovered prior to the Policy period.  In other words, if the insured suffered bodily

injury and/or property damage *both* before and after the effective date of the Policy,

as in this case, the damage that occurred during the Policy period will only be covered

if it was caused by a separate "occurrence" than that which caused the pre-Policy

damage.  (Pl. Ex. 1).  To determine whether the damage alleged in this case was

22

caused by one continuous occurrence or multiple occurrences, the court applies state law.

In the context of an insurance policy like the one at issue here, Alabama law employs the "cause analysis" to define how many occurrences led to the damages for which coverage is sought. *United States Fire Ins. Co. v. Safeco Ins. Co.*, 444 So.2d 844, 846-47 (Ala. 1983). The salient question is whether there has been "but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage," *i.e.*, one occurrence, or whether the initial cause was "interrupted or replaced by another cause" such that there were two or more occurrences. *Safeco*, 444 So.2d at 847 (internal quotations and citations omitted). If the chain of causation was not broken, a single occurrence extends to encompass *all* of the damage proximately resulting from it. *Id.*; *see also St. Paul Fire & Marine Ins. Co. v. Christiansen Marine Inc.*, 893 So.2d 1124, 1137 (Ala. 2004). "Thus, a single occurrence may result in multiple injuries to multiple parties over a period of time; but if one cause is interrupted and replaced by another intervening cause, the chain of causation is broken and more than one occurrence has taken place." *Home Indem. Co. v. City of Mobile*, 749 F.2d 659, 662 (11th Cir. 1984).

> c.   **The damages discovered in 2006 during the Policy period were merely a continuation or resumption of pre-Policy damage stemming from the same proximate cause**

In this case, the Gibson defendants argue that the damages discovered in September 2006 fall within the scope of coverage because they flow from the 2004 repairs, an occurrence distinct from the initial construction of the home.   The defendants primarily cite *Safeco* in support of this contention.  (*See* Doc. # 34 at 18-22)(citing 444 So.2d at 845-47)).  In *Safeco*, water leaked through various cracks and holes in the roof of a building and caused damage to the lessee's merchandise. *Safeco*, 444 So.2d at 845.  Sometime later, the lessee sustained additional damages from another rainfall when the roofing company making repairs failed to effectively cover a portion of the roof on which it was working.  *Id.*   The issue presented to the Alabama Supreme Court was whether the additional damage caused by the later rainfall, resulting from the roofing company's negligence while working on the repairs, was part of a single occurrence.  *Id.* at 846.  The Alabama Supreme Court concluded that two separate occurrences had taken place, because the additional damage was caused by a separate, intervening cause - the negligence of the roofing crew while it was working - rather than the prior condition of the roof:

> The damage caused by the roofing crew's failure to adequately cover the exposed portion of the roof was not proximate to the cracks and holes

24

> in the other areas of the roof; nor did the latter cause the former. The lack of a proximate causal link between the two is evident if we assume, hypothetically, that the roof had no cracks or holes prior to the re-roofing attempt by Bama Roofing. The resulting damage from the negligent failure to cover the exposed area would clearly have no relation to the condition of the roof prior to the repair attempt. Furthermore, the two events are easily distinguishable in time and space, and one event did not cause the other.

*Id.* at 847.  Thus, the initial water damage was caused by the "occurrence" of the leaky roof, while the later damage was caused by the "occurrence" of the roofing crew negligence.  *Id.*

Unfortunately for the defendants, the facts of this case are distinguishable from the facts of *Safeco*.  The Policy in this case makes clear that a continuation or resumption of pre-Policy damage falls outside of the scope of covered damage.  (Pl. Ex. 1).  And the complaint in this case makes clear that the damage for which the Gibson defendants seek coverage is merely a *continuation* of the very same damage caused by the initial construction:

> Within the first year the Plaintiffs discovered numerous latent defects in accordance with their warranty.  The defendant builder . . . made repairs in accordance with the warranty and represented to the Plaintiffs that the issues with the moisture intrusion had been rectified and that the resulting damage had been repaired.  The Plaintiffs discovered in approximately fall of 2006 *that the repair work did not correct the problems with the original construction and that the remediation efforts had failed.*

(Shelby County Compl. at 2-3 (emphasis added)).   The complaint identifies seven "conducive conditions that should have been repaired during the initial repair/remediation of the residence" and alleges that damage continues to occur because "the causative factors for the previous intrusion and resulting damage had been concealed during the repairs attempts in 2004." (Shelby County Compl. at 3). Thus, even the underlying complaint alleges that all of the "bodily injury" and "property damage" claimed by the Salems relates back to the faulty original construction.

Although the Salems allege that, even after the 2004 repairs, they continued to suffer new bodily injury and property damage from moisture intrusion and other "conducive conditions," the complaint illuminates that there was but *one cause* for that damage – the latent defects in the initial construction.  The pre-Policy property damage *continued* because the 2004 repairs concealed the latent defects that were causing the damage, and the pre-Policy bodily injury *resumed* when it became apparent the initial problems were not corrected.  In other words, the latent defects - not the repairs - *caused* the damage.  That the damage was ongoing merely indicates that one occurrence caused multiple, continuous damages; it does not indicate that there were multiple occurrences.  *See Safeco*, 444 So.2d at 846 ("The fact that there were multiple injuries and that they were of different magnitudes and that injuries

26

extended over a period of time does not alter our conclusion that there was a single occurrence. As long as the injuries stem from one proximate cause there is a single occurrence.").[12]

Thus, the alleged "negligence" of the repair work is the failure to *correct the damages caused by the original construction*, not the creation of new and distinct damages, as was the case in *Safeco*.  Despite the recurring damage allegedly suffered by the Salems, there was no intervening cause which broke the connection between: (1) the original cause of the mold and moisture problems and bodily injury - the alleged poor construction; and (2) the mold and moisture problems that were rediscovered, and bodily injury that resumed, in 2006 after the 2004 repairs failed to fix the initial problems.  Unlike in *Safeco*, where the roof being left open during repairs caused new and distinct damage beyond the damage caused by cracks and holes in the leaky roof, the 2004 warranty repairs did not cause damage.  Instead, the repairs superficially concealed the latent defects from the Salems for a period of time, sparing them, for a brief intermission, from damage stemming from those defects.

---

[12] Under *Safeco*, the Gibson defendants' contention that there were two occurrences because the Salems discovered "new evidence of moisture intrusion and related damage in the master bathroom" in 2006 and suffered new mental anguish, cuts no ice at all.  That multiple injuries resulted, or even that those injuries were of different magnitudes, does not transform one occurrence into two.

The court therefore concludes that because there was but one proximate cause of the damages allegedly suffered by the Salems - the initial construction of the home - the claims made by the Salems are not covered under the Policy.  It is undisputed that the Gibson defendants knew about the Salems' allegations relating to the original construction before they obtained the Policy, and the Gibson defendants implicitly concede that those complaints about damage from the original construction are not covered.   The Policy makes clear that if the insured knew that "'bodily injury' or 'property damage' had occurred, in whole or in part," before the Policy period began, "then *any continuation, change or resumption* of such 'bodily injury' or 'property damage' . . . will be deemed to have been known prior to the policy period."  (Pl. Ex. 1)(emphasis added).   Therefore, because the Gibson defendants knew prior to the Policy period that the Salems claimed damage based upon the initial construction of their home, and because any new damages suffered by the Salems during the Policy period were merely a continuation or resumption of pre-Policy damage, Nationwide does not have a duty to defend the Gibson defendants in the underlying lawsuit.

### 2.    The 2004 Repairs Do Not Constitute an "Occurrence"

Alternatively, even if the court assumes, *arguendo*, that the 2004 repairs are a separate, intervening cause of bodily injury and property damage (such that the damage discovered by the Salems during the Policy period is more than just a

continuation of pre-Policy damage), Nationwide nevertheless is relieved of its duty to defend because the 2004 repairs do not qualify as an "occurrence" under the terms of the Policy and relevant Alabama law.  Pursuant to the Policy, *all damage* for which an insured seeks coverage must have been caused by an "occurrence," defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (Pl. Ex. 1).[13]  All of the Salems' claims for negligence, misrepresentation/fraud, suppression, breach of express and implied warranties, and breach of contract arise out of two alleged occurrences: (1) the initial construction of the home, which is undisputedly outside of the scope of coverage in this case; and (2) the 2004 repairs. (Shelby  County Compl. at 3).

The facts of this case are not novel.  The Alabama Supreme Court previously has considered, under similar circumstances and virtually identical policy language, whether claims arising out of the allegedly defective construction of a home constitute a covered "occurrence."  In *United States Fidelity v. Guar. Co. v. Warwick Development Co., Inc.*, 446 So.2d 1021 (Ala. 1984), the Alabama Supreme Court held that the "faulty workmanship" and use of "noncomplying materials" in the

---

[13] Although the Gibson defendants point to case law holding that "the term 'accident' does not necessarily exclude human fault called negligence," (Doc. # 34, at 14), that does not mean that every act of negligence is covered under the Policy terms.  The relevant inquiry is whether the negligence alleged relates to "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

construction of a home was not an "accident," and thus did not constitute an "occurrence," as defined almost identically to the one in this Policy. *Warwick*, 446 So.2d at 1022-23. Accordingly, the Court found that the insurer had properly denied the insured home contractor a defense and indemnification against the home purchasers' claims for damage to their home based upon numerous "defects throughout the structure." *Id.* at 1022.

Similarly, in *Berry v. South Carolina Ins. Co.*, 495 So. 2d 511 (Ala. 1985), the Alabama Supreme Court found that an insurance carrier was not required to provide a defense for its insured home contractor against a homeowners' claims for breach of contract, misrepresentation, and breach of warranty, all of which arose out of work performed by the contractor that caused damage to the homeowners' residence. *Berry*, 495 So.2d at 511-13. In so finding, the Court held that "all of the 'damages' [claimed by the homeowners] related to the work done pursuant to the contract" between the contractor and homeowners, and thus "any damage to the existing [home] structure [was not] a result of 'an accident'" and did not qualify as an "occurrence" pursuant to the policy. *Berry*, 495 So.2d at 513. Based upon this case law, it certainly appears that the claims in this case arising out of the 2004 allegedly defective repair work do not constitute a covered occurrence.

30

The Gibson defendants' opposition arguments miss the mark.  Rather than focus on the *factual content* of the claims pled in the underlying complaint, the Gibson defendants emphasize the *general labels* assigned to those claims. (Doc. # 34, at 14-18). They argue that *any* claim for "negligence" or "misrepresentation," apparently without regard to that claim's factual underpinnings, constitutes a covered "occurrence" under this Policy so long as it is not based upon "intentional" conduct. (*Id.*)(collecting cases).  Such an argument runs contrary to Alabama case law because it fails to take into consideration the underlying conduct at issue in the complaint that is not an "accident" according to the Alabama Supreme Court -- the insured's alleged faulty construction and repair work.  *See also Auto-Owners Ins. Co. v. Toole*, 947 F.Supp. 1557, 1564 (M.D. Ala. 1996)("In determining whether there is coverage, the court should look to the specific 'kind of . . . claim' being asserted, regardless as to whether it is labeled a contract claim, a tort claim or whatever, and the 'purpose of the general liability policy' from which coverage is sought.").

Therefore, based upon the authority of *Berry* and *Warrick*, the court finds that the conduct described by the Salems in their underlying complaint falls outside of the definition of "occurrence" and thus, outside of the scope of coverage.  Accordingly, for this independent and alternative reason, Nationwide is not obligated to defend the

Gibson defendants against these claims and is due to have summary judgment granted in its favor.

### 3.    The Exclusion for "Your Product" Also Bars Coverage

Moreover, the Policy exclusion from coverage for "Your Product" also serves as yet another reason why Nationwide owes no duty to defend the Gibson defendants against the Salems' claims in this case.  The Policy provides that "this insurance does not apply to . . . 'property damage' to 'your product' arising out of it or any part of it."  (Pl. Ex. 1).   Your "product" is defined as "[a]ny goods or products . . . manufactured, sold, handled, distributed, or disposed of by" the insured, as well as "warranties or representations made at any time with respect to the fitness, quality, durability, performance, or use" of the product.  (Pl. Ex. 1).

Alabama courts construing similar contract provisions have held that such language excludes any coverage for damage to the actual product or work of the insured.  In *United States Fid. And Guar. Co. v. Bonitz Insulation Co. of Alabama*, 424 So.2d 569 (Ala. 1982), the Alabama Supreme Court found that the alleged negligent installation of a roof by Bonitz, the insured and an insulation contractor, constituted Bonitz's "product" as defined by the relevant policy's exclusions from coverage.  *Bonitz*, 424 So.2d at 573.  Bonitz had provided roofing and insulation to the City of Midfield, Alabama, on a school gymnasium project comprised of the work

32

of many different contractors. *Id.* at 570.  After construction was completed, the roof

constructed by Bonitz began to leak, which caused damage not only to the roof itself,

but also to the ceilings, walls, carpets, and floor of the gymnasium, all of which had

been constructed by other contractors. *Id.* at 570-72.  Bonitz sought coverage from

its insurer for all of the damage caused by the leaky roof, and the Alabama Supreme

Court found that "several of the exclusions apply to remove liability for damage to

the roof itself" because "the roof is ultimately Bonitz's product in the sense that it is

the end result of work performed by or on behalf of Bonitz[.]" *Id.* at 573.  In so

noting, the court distinguished the damage to the roof from the damage to work

performed by other contractors:

> If damage to the roof itself were the only damage claimed by the City of
> Midfield, the exclusions would work to deny Bonitz any coverage under
> the USF&G policy. The City of Midfield, however, also claims damage
> to ceilings, walls, carpets, and the gym floor. We think there can be no
> doubt that, if the occurrence or accident causes damage to some other
> property than the insured's product, the insured's liability for such
> damage becomes the liability of the insurer under the policy.

*Id.* at 573.

The reasoning of *Bonitz* applies to this case  –  an insured's "product" is "the

end result of work performed by or on behalf of [the insured]." *Bonitz*, 424 So.2d at

573.  However, in this case, unlike in *Bonitz*, the Gibson defendants do not seek

coverage for damage to any other product *but their product*.  Indeed, the Salems'

*entire house* constitutes the insured's "product" in this case. *See also Indiana Insurance Co. v. Dezutti*, 408 N.E. 2d 1275 (Ind. 1980)(finding that the entire house built by the insured contractor constitutes its "product" under policy exclusion). As Nationwide points out in its reply brief, "the underlying Complaint deals with the alleged negligent construction of an entire home which caused damage to that home and no *other* property. Any repair word was done as warranty work . . . . " (Doc. # 37, at 3). Thus, the exclusion applies to any and all product damage claimed in this case because only the *insured's* "product" was allegedly damaged by the insured's own actions.

In opposition, the Gibson defendants argue only that a house is "real property" and thus cannot be a "product." (Doc. # 34, at 27-28)(citing a treatise, cases from other jurisdictions, and an 1880 Alabama case). The court does not address the merits of this contention because, *even if it were persuaded by that theory*, the Salems' claims would fall within a different exclusion of the Policy – the exclusion for "real property." The Policy clearly states that damage is excluded from coverage if to "[t]hat particular part of real property on which you or any contractor or subcontractor working directly or indirectly on your behalf is performing operations, if the 'property damage' arises out of those operations[.]" (Pl. Ex. 1, Liability Coverage Form, B. Exclusions, at 4). The Gibson defendants cannot have it both ways - either the

34

Salems' claims fall within the "your product" exclusion, or they fall under the "real property" exclusion. Either way, the damages claimed in this case fall outside of the scope of coverage. For this third - and alternative - reason, Nationwide owes the Gibson defendants no defense.[14]

## B.    Counterclaims

Having resolved the matter of Nationwide's duty to defend in its favor, the court now turns to the Gibson defendants' counterclaims against Nationwide for breach of contract and bad faith failure to defend and investigate. (Doc. #11).[15]

---

[14] Although Nationwide makes other arguments in support of its motion for summary judgment, the court does not reach them here. Given the availability of three alternative reasons for granting summary judgment on the duty to defend, any additional support for the court's decision is superfluous.

　　The court notes, however, that it harbors *serious* concern about the Gibson defendants' failure to promptly notify Nationwide of the Salems' claims against them. Indeed, it was not until sometime around August 21, 2007, that the Gibson defendants notified Nationwide of the claims made by the Salems against them and requested defense and indemnification. (Pl. Ex. 19). Although the Policy had been in effect since December 2003, Nationwide had no notice of the Salems' complaints until over *three years* after the Salems demanded in January 2004 that the Gibson defendants repair the latent defects (Pl. Ex. 15), and complained in May 2004 that the Gibson defendants had not sufficiently repaired the water intrusion points and "moldy wall" (Pl. Ex. 17). Even as to the most recent of the Salems' damage allegations - the September 2006 complaint to the Gibson defendants that "the repair work did not correct the problems with the original construction and that the remediation efforts had failed" (Shelby County Compl. at 3) - notice was not given to Nationwide until *eleven months later*. Courts have found that delays of much shorter duration are unreasonable and preclude coverage. *See Acceptance Ins. Co. v. Schafner*, 651 F.Supp. 776, 777-78 (N.D.Ala. 1986)(finding that a six-month delay in providing notice is unreasonable); *Phoenix Assurance Co. v. Harry Harless Co.*, 303 F.Supp. 867, 868 (N.D.Ala. 1969), *aff'd* 414 F.2d 794 (5th Cir. 1969) (holding that four-month delay in providing notice is unreasonable).

[15] As noted earlier, the court has already dismissed the counterclaims alleging negligence and wantonness. (Doc. #20).

Nationwide contends that it is entitled to summary judgment on both of these counterclaims.  The court agrees.

### 1.    Breach of Contract

The Gibson defendants' breach of contract counterclaim against Nationwide is based upon Nationwide's alleged "refus[al] to defend or indemnify" and failure to " consider or give prompt attention to [new] information."  (Doc. # 11, at ¶¶ 17-18). More specifically, the Gibson defendants allege that Nationwide contractually "agreed to provide a defense and indemnify" them, "agreed that [it] would consider any additional information that Gibson Anderson wished to present . . . , [and agreed that it would] give prompt attention to any new information."  (Doc. #11 ¶¶ 15-16). The Gibson defendants contend that "Nationwide has breached its agreement" as to these duties.  (*Id.*).

"The elements of a breach-of-contract claim under Alabama law are (1) a valid contract binding the parties; (2) the plaintiff['s] performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages."  *Cook's Pest Control, Inc. v. Rebar*, __ So.2d __, 2009 WL 418074, at *10 (Ala. 2009) (internal quotations and citations omitted).  The Gibson defendants essentially argue that two breaches occurred in this case: (1) when Nationwide opted not to defend and/or indemnify

36

them; and (2) when Nationwide allegedly failed to consider additional evidence provided by the Gibson defendants.

With respect to the former, the court's earlier determination that Nationwide owes the Gibson defendants no duty to defend is dispositive.  For all of the reasons outlined *supra* in Section IV.A. -  including the absence of covered damage, lack of cognizable "occurrence," and exclusion for "your product" -  the Gibson defendants cannot establish that Nationwide failed to perform in accordance with the contract terms. To the contrary, the court has already found that Nationwide did, in fact, meet its performance obligations under the Policy.

As to the latter, the court finds no relevant, material evidence in the record to support the Gibson defendants' bald assertion that Nationwide failed to consider new information regarding the Salems' claims.  *See Fitzpatrick*, 2 F.3d at 1115-16. Indeed, the undisputed facts make clear that the filing of this declaratory judgment lawsuit *was* Nationwide's prompt response  to the new information presented by the Gibson defendants.

The record shows that during the entire period in which Nationwide was providing the Gibson defendants a defense,[16] it did so pursuant to a reservation of

---

[16] As noted earlier, the record is silent as to the exact date on which Nationwide assumed defense of the Gibson defendants, but it appears that it occurred sometime between August 21, 2007 and January 22, 2008.  (*See* Pl. Exs. 21-22).  The Gibson defendants' counterclaim avers, without

rights and with full notice to the Gibson defendants that Nationwide was continuing to investigate some serious coverage concerns.  Indeed, Nationwide informed the Gibson defendants by letter in November 2007,[17] January 2008, and February 2008 that its investigation of the Salems' claims was ongoing.  (Pl. Exs. 21-26).   On February 18, 2008, Nationwide notified the Gibson defendants that, as a result of its investigation, it had concluded that it did not have a duty to defend nor indemnify the Gibson defendants for the lawsuit filed by the Salems, and that accordingly, Nationwide would cease its defense of the Gibson defendants as of March 9, 2008.  (Pl. Ex. 28).  However, Nationwide stated that any additional information the Gibson defendants wished to present on the matter would be taken into consideration.  (*Id.*).  On February 29, 2008,[18] the Gibson defendants, via their attorneys, sent a number of queries to Nationwide regarding the reasons for the denial, demanding that Nationwide reconsider its position.  (Doc. # 11, Ex. 2; Doc. # 33, Ex. 3).  Two weeks

citation to evidence: "By letter dated December 21, 2007, Gibson Anderson received correspondence from an attorney stating that he was defending Gibson Anderson in the Underlying Lawsuit."  (Doc. # 11, at 7, ¶ 3).

[17] On November 8, 2007 Nationwide warned the Gibson defendants that "[t]he reported facts give rise to some potential coverage questions under the" Policy, specifically "the date in which the incident occurred."  (Pl. Ex. 21).  Nationwide further advised that it needed more information to assess the claim and that "[t]he company's position relative to coverage will be stated upon completion of this assessment."  (*Id.*).

[18] The Gibson defendants erroneously refer to this letter as the "February 27, 2008" letter. (Doc. # 34, at 34).

later on March 18, 2008, Nationwide responded by filing this declaratory judgment in federal court.

That Nationwide did not respond to the Gibson defendants' queries by corresponding directly with them via letter[19] is simply not evidence that Nationwide failed to consider their contentions regarding coverage.   To the contrary, Nationwide's decision to file this lawsuit indicates that it *did* consider the Gibson defendants' contentions and sought a ruling from the court regarding coverage instead of resting on its previous denial.   The Gibson defendants cannot establish that Nationwide failed to consider or investigate new information presented to it after the denial decision was made.   For these reasons, Nationwide is due summary judgment as to the Gibson defendants' breach of contract counterclaim.

### 2.      Bad Faith Failure to Defend and Investigate

Next, the Gibson defendants claim that "Nationwide intentionally refused to provide a defense to, or indemnify [them with] . . . no legitimate or arguable reason for this failure."   (Doc. # 11, at 12).   The Gibson defendants further claim that "Nationwide either intentionally or recklessly failed to properly investigate the claim or subject the results of the investigation to a cognitive evaluation and review."   (*Id.*).

---

[19] The Gibson defendants claim "Nationwide did not answer, and as of today still has not answered, Gibson and Anderson's questions [posed in the February 2008 letter]."   (Doc. # 34, at 34).

39

The Alabama Supreme Court has made clear the difference between this claim and a breach of contract claim: "Bad faith . . . is not simply bad judgment or negligence. It imports a dishonest purpose and means a breach of a known duty, *i.e.*, good faith and fair dealing, through some motive of self-interest or ill will." *State Farm Fire & Cas. Co. v. Slade*, 747 So.2d 293, 303-04 (Ala.1999) (internal quotations and citations omitted).

Under Alabama law, a plaintiff may establish a bad faith claim by two different methods. The first method - designated as "normal" or "ordinary" - carries a heavy burden for the plaintiff of showing "the absence of any reasonably legitimate or arguable reason for denial of a claim." *Singleton v. State Farm Fire & Cas. Co.*, 928 So.2d 280, 283 (Ala.2005)(internal quotations and citations omitted). The elements of the "normal" claim include: "(1) the existence of an insurance contract; (2) an intentional refusal to pay the claim; and (3) the absence of any lawful basis for refusal and the insurer's knowledge of that fact or the insurer's intentional failure to determine whether there is any lawful basis for its refusal." *Acceptance Ins. Co. v. Brown*, 832 So.2d 1, 16 (Ala. 2001). "For a 'normal' bad-faith claim to be submitted to the jury, the underlying contract claim must be so strong that the plaintiff would be entitled to a preverdict judgment as a matter of law." *Shelter Mut. Ins. Co. v. Barton*, 822 So.2d 1149, 1155 (Ala. 2001). "In short, [the] plaintiff must go beyond

40

a mere showing of nonpayment and prove a bad faith nonpayment, a nonpayment without any reasonable ground for dispute." *National Sec. Fire & Cas. Co. v. Bowen*, 417 So.2d 179, 183 (Ala.1982).

However, the Alabama Supreme Court has established a different burden for plaintiffs alleging "abnormal" or "extraordinary" bad faith cases, which "dispense[s] with the predicate of a preverdict [judgment as a matter of law] for the plaintiff on the contract claim if the insurer had recklessly or intentionally failed to properly investigate a claim or to subject the results of its investigation to a cognitive evaluation." *Employees' Benefit Ass'n v. Grissett*, 732 So.2d 968, 976 (Ala.1998). The benefit of this method is limited to plaintiffs alleging only:  "(1) intentional or reckless failure to investigate a claim; (2) intentional or reckless failure to properly subject a claim to a cognitive evaluation or review; (3) the manufacture of a debatable reason to deny a claim; or (4) reliance on an ambiguous portion of a policy as a lawful basis for denying a claim."  *Singleton*, 928 So.2d at 283.  If a claim falls into the "abnormal" or "extraordinary" category, the insured must show: "(1) that the insurer failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review; and (2) that the insurer breached the contract for insurance coverage with the insured when it refused to pay the insured's claim." *Brown*, 832 So.2d  at 16.

41

In either situation, "contractual liability is a *prerequisite* for liability for bad faith. Therefore, one who cannot prove []he was entitled to benefits under an insurance policy cannot recover on a bad-faith claim." *Brown*, 832 So.2d at 16 (emphasis added) (citing *Slade*, 747 So.2d at 318 (noting that bad-faith liability is limited to those cases in which the insured is entitled to benefits under the policy)). In the absence of a breach of the Policy, there can be no bad faith liability. Thus, the court's finding that Nationwide did not breach its contractual duties to defend the Gibson defendants and/or to investigate the new information they provided, is dispositive of this claim as well.[20]

## V.    Conclusion

For all of the reasons outlined above, the court finds that Nationwide has carried its burden on summary judgment of demonstrating that there are no material

---

[20] Moreover, even assuming that Nationwide was not due summary judgment on the duty to defend, the record suggests that, at the very least, a "reasonable ground for dispute" existed on this matter.  *Ex parte Alfa Mutual Ins. Co.*, 799 So.2d 957, 962 (Ala. 2001).

facts in dispute and that it are entitled to judgment as a matter of law on both the

declaratory judgment on the matter of the duty to defend and the Gibson defendants'

remaining counterclaims.

      **DONE** this the _____1st_____ day of September, 2009.


_____
SENIOR UNITED STATES DISTRICT JUDGE